**KENNETH D. LAUB & COMPANY, INC., Plaintiff,**

v.

**BOARD OF THE STATE TEACHERS RETIREMENT SYSTEM OF OHIO; State Teachers Retirement System of Ohio, Defendants.**

**No. 98 Civ. 993(MGC).**

United States District Court, S.D. New York.

Jan. 11, 2000.

Dreier & Baritz LLP, New York City by Marc S. Dreier, Susan E. Lustbader, for Plaintiff.

Stroock & Stroock & Lavan LLP, New York City by Kevin L. Smith, David A. Sifre, for Defendants.

### OPINION

CEDARBAUM, District Judge.

Plaintiff Kenneth D. Laub ("Laub"), through his business Kenneth D. Laub & Co., Inc., sues the Board of the State Teachers Retirement System of Ohio and State Teachers Retirement System of Ohio (collectively "STRS") for breach of contract. Laub alleges that defendants denied him a commission for a real estate transaction in violation of the terms of his agency agreement. Defendants move for summary judgment. For the reasons discussed below, the motion is granted.

### BACKGROUND

The following facts are undisputed unless otherwise noted.

■ Kenneth D. Laub & Co., Inc. and its president Kenneth D. Laub are real estate brokers licensed in New York. In 1988, Laub entered into an agreement with Two Wall Street West Associates, L.P., the owner of a building at Two Rector Street in New York City (the "Premises"), granting Laub the exclusive authority to rent space in the Premises. The agreement provided that Laub would be paid commis-

sions for leases Laub procured for the Premises, including lease extensions. The original term of the agreement expired in 1989 and was renewed and amended on numerous occasions in subsequent years.

In mid–1993, Laub began negotiations with the City of New York (the "City") for a renewal of the City's lease for space in the Premises occupied by the City's Department of Transportation. The City's original lease was to expire on July 31, 1995.

In December 1994, Laub was informed that ownership of the premises had been transferred to OTR, an Ohio general partnership. Laub was authorized to continue all discussions on behalf of OTR with respect to pending transactions. Laub negotiated many of the terms for a renewal lease and claims that a "meeting of the minds" was reached in January 1995 on the essential terms of a lease renewal.

On March 8, 1995, Laub and OTR signed an extension of Laub's agency contract (the "Agency Agreement"). The Agency Agreement provided that it would terminate on June 30, 1995, unless terminated earlier by either party on thirty days' notice. The provisions of the Agency Agreement at the center of the present dispute are as follows:

> No commission shall be earned, due or payable to [Laub] under this Agreement for any lease not so entered into within [180 days], whether or not negotiations are pending on the date this Agreement expires or is terminated. Landlord shall not delay negotiations in order to avoid commission payment to [Laub].

(Laub Aff. Ex. 1 at S 0252.)

On April 20, 1995, OTR gave Laub notice that it was terminating the Agency Agreement. Accordingly, the agreement terminated thirty days later on May 20, 1995, and November 16, 1995 became the end of the 180–day grace period within which Laub was entitled to be paid a commission.

On July 31, 1995, the City's original lease expired. No lease extension was executed until December 13, 1996, more than a year after the 180–day grace period had expired.

Laub complains that he was entitled to a commission for the work he performed in connection with the lease extension. He acknowledges that the lease extension was not executed until well after the expiration of the time in which he was entitled to a commission. However, he contends that defendants intentionally delayed negotiations with the City in order to avoid paying him a commission and thus breached the Agency Agreement. Had defendants more vigorously attempted to obtain a lease extension with the City, Laub argues, an extension would have been executed within the 180–day grace period and he would have received a commission for his work. Defendants deny these allegations.

## DISCUSSION

Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This requires that the party opposing summary judgment "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the exis-

tence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In order to defeat summary judgment, Laub must present admissible evidence from which a finder of fact could reasonably conclude that defendants[1] intentionally delayed negotiating a lease extension with the City in order to avoid paying Laub a commission.[2] Laub has presented no such evidence, and in fact the evidence in the record all supports the contrary conclusion.

Defendants produce evidence demonstrating that the delay in lease negotiations was caused not by them but rather by the City. City representatives testified in their depositions that defendants did not delay the lease renewal negotiations. Scott Bernstein, the Lease Negotiator for the City, was responsible for negotiating the business terms of the lease on behalf of the City. Mr. Bernstein testified that any delay in negotiating the lease was caused by the City and not by defendants:

> Q. At any time during the negotiations since your involvement began with the renewal lease transaction did you ever come to believe that STRS was delaying the finalization of that renewal lease transaction?

> \*    \*    \*    \*    \*    \*

> A. No, in my time dealing with them I do not believe that they were delaying the deal. At any point.

> Q. Were there delays in the transaction?

> A. Yes, there were .... they were mostly brought on by the City of New York.

(Bernstein Dep. at 43.) Furthermore, when asked whether defendants ever stated a preference to delay the transaction, Mr. Bernstein testified:

> A. No. In fact, I would say to the contrary, that they wanted to get this done, because they were not getting rent payments.

(*Id.* at 71.)

Other city negotiators confirmed this view. Jeffrey Kondrat, the Commissioner of Leasing and Space Design, was Mr. Bernstein's supervisor and also had knowledge of the lease negotiations. Mr. Kondrat testified that defendants were anxious to conclude the lease transaction from the time OTR took over the building in November of 1994. He also testified that the loss of City staff caused a delay in completing the transaction and that the City was lax in responding to defendants' communications concerning the lease. Lisa Stenson, who acted as counsel to the City, also had first-hand knowledge as to why the lease extension was not executed by November 16, 1995. Ms. Stenson testified that she did not believe that defendants did anything to delay the negotiations.[3]

---

**1.** Though OTR was named as a defendant in a prior version of the Complaint, the current version does not name OTR as a defendant. Defendants claim that since the Agency Agreement at issue involved only OTR and Laub, they cannot be sued for breach of contract because they were not parties to the agreement. Plaintiff responds by pointing to the provision of the Agency Agreement describing OTR as "the duly authorized nominee for the Board of the State Teachers Retirement System of Ohio," claiming that OTR was defendants' agent. Because the parties address this issue only in two brief footnotes, and because it is not necessary to the disposition of this motion, the issue will not be addressed. However, since the parties refer

to OTR and STRS interchangeably, for purposes of clarity the term "defendants" will be used to refer to both.

**2.** Defendants also contend that an exculpation clause in the Agency Agreement requires any recovery to be satisfied by the owner's interest in the building. Because defendants no longer own the building at issue, they argue, Laub is precluded from any recovery from defendants. This issue need not be resolved to dispose of this motion and will thus not be addressed.

**3.** Indeed, Laub himself appears to have shared this view prior to the present litigation. In an internal business memorandum

Furthermore, the specific history of the lease negotiations demonstrates that defendants not only did not delay negotiations, but encouraged the City to respond more quickly. The initial attorney for the City, Elvin Williams, prepared a draft lease agreement dated March 29, 1995 and provided it to defendants. On April 5, 1995, Mr. Bernstein provided OTR's counsel, Linda Warren, a copy of the draft lease with instructions to review it and contact Mr. Williams with her comments.

Ms. Warren marked up the draft lease and provided the mark-up to Mr. Williams on May 16, 1995. However, Mr. Williams did not transmit the mark-up to Mr. Bernstein until June 8, 1995, a day after Ms. Warren wrote to Mr. Williams "to confirm that the document is still being reviewed by [him] and that [he did] not anticipate any major problems in the comments which have been made [on May 16, 1995]." (Sifre Decl. Ex. 6.) The letter also advised that "[i]f there is any other reason why you have not responded to our draft, I would appreciate your letting me know at your earliest convenience." (*Id.*) This message was repeated in a letter from Ms. Warren to Mr. Williams on June 22, which stated that "[w]e are still awaiting your response." (Sifre Decl. Ex. 7.) Ms. Warren wrote yet another letter to Mr. Williams on July 26 "reminding you that we are still awaiting your response to the Lease Extension Agreement for 2 Rector Street sent to you on May 16, 1995.... *Your immediate attention to this matter is requested.*" (Sifre Decl. Ex. 8.) (emphasis added)

All of the evidence in the record indicates that defendants continued to attempt to advance the lease renewal negotiations. By October 17, 1995, the City had not yet provided a response to Ms. Warren's mark-up. On October 17, Mr. Bernstein informed Ms. Warren that the City would submit to her a revised lease draft within a week. Mr. Bernstein also informed Ms. Warren that the City's policy on lease renewals had recently changed—the City now preferred to enter into new lease agreements rather than execute extension agreements. Ms. Warren then wrote to Ms. Stenson, who had taken over for Mr. Williams, "to inquire as to the status of your review and comments to the Lease Extension Agreement submitted to your office last May." (Sifre Decl. Ex. 9.) The letter also stated:

> We would be happy to consider all these new changes, but *I must impress upon you our concern over the length of time involved thus far in getting a response* on the draft we submitted to your office last May. As you may be aware, the City's lease expired last July and, according to Scott [Bernstein], the City has no authority to continue to pay rent on expired contracts.... November 1 is only two weeks away and, given our past experiences, we feel it is highly unlikely that this agreement will be executed and delivered by that date, which means that the landlord will have missed at least two months payment of rent. *If there is anything at all we can do to expedite this matter, we would appreciate your letting us know.*

(*Id.*) (emphasis added)

Despite this request, the City did not provide a draft lease proposal until January 4, 1996. This delay was caused at least in part by the fact that Ms. Stenson and Mr. Bernstein became involved in other matters "that were considered more of a priority nature which required our attention." (Bernstein Dep. at 235.) It was also caused in part by the City's decision to draft a completely new lease rather than a "16 or 17 page lease renewal." (Kondrat Dep. at 18.)

prepared September 29, 1995, Laub documented a meeting with City officials and described the purpose of the meeting as "to discuss the slow down by New York City in

signing a lease for Two Rector and the implications on [Laub's] financial arrangement with OTR." (Sifre Decl. Ex. 14.)

Defendants' position is further supported by the fact that the negotiations took more than an additional year after November 16, 1995 to reach completion. If OTR were attempting to avoid paying Laub a commission, it would not have made sense for them to continue to delay negotiations past that point.

Laub presents no evidence contradicting any of these facts. Instead, he relies on numerous forms of circumstantial evidence which he claims create an issue of fact. Laub first points out that he was shut out of negotiations with the City by Mr. Sisson of STRS. Specifically, Mr. Sisson ceased communicating with Laub in early April 1995 and instructed the City as early as March 1995 not to deal with Laub further. Mr. Sisson also failed to communicate with the City in May and June of 1995. These facts, Laub argues, demonstrate that OTR acted in bad faith and intended to delay lease negotiations.

However, even if Laub's allegations that he was shut out of the negotiating process are true, they do not contradict defendants' substantial evidence that they did not delay the negotiations. Laub had no right to participate in the negotiations once he was terminated. Indeed, even if he was shut out shortly before his termination, defendants provide ample evidence that they had legitimate business reasons to do so,[4] and Laub presents no evidence that his involvement in the negotiations would have led to their timely conclusion. Finally, Laub presents no evidence demonstrating that Mr. Sisson was in fact unavailable to the City during the period cited. More importantly, even if there were such evidence, there is no evidence that the City needed to speak to Mr. Sisson or that his unavailability resulted in any delay. In fact, defendants' evidence all indicates that Ms. Warren had taken the lead on negotiations with the City.

Laub next argues that defendants failed to "aggressively pursue" lease renewal negotiations because no eviction proceedings were initiated against the City once its original lease expired. This claim is deficient for a number of reasons. First, the Agency Agreement only required that OTR not delay negotiations, not that it pursue any extreme measure available to force the City into a lease before 180 days expired. Second, the decision not to institute such proceedings was well within OTR's business judgment. Had OTR chosen to evict the City, it risked losing an important tenant. Laub himself acknowledges that OTR "had a huge incentive to act to the contrary" and that the City "clearly had plenty of options to go to other buildings where they had existing space." (Laub Dep. at 67, 72.) Third, and most importantly, Laub presents no evidence that if OTR had instituted such proceedings the City would have signed a lease renewal at all, let alone before November 16, 1995. Laub's assertion that an extension would have been executed by this date is sheer speculation.

Laub next points to an alleged statement by Matthew Vulanich of STRS, whom Laub believes was Mr. Sisson's successor, that "OTR and Defendants may have delayed the City's renewal lease transaction in order to avoid paying KDLC a commission." (Laub.Aff.¶ 25.) However, there is no evidence demonstrating that such a statement was made. Laub was asked during his deposition whether Vulanich made such a statement to him, and Laub responded "Mr. Vulanich never said such a thing." (Laub. Dep. at 66.) Furthermore, a letter from Laub to his attorney in which he describes his conversation with Vulanich only says that "Mr. Vulanich stated that he recognizes that the contract may represent a method of avoiding payment to Laub." (Laub.Aff.Ex. 17.) Even if Mr. Vulanich made such a statement, it is merely an accurate description of the

---

4. Laub himself provides such evidence when he claims that the City's negotiators were "biased" against him because they described him as "screaming" and "slanderous." (Def. Mem. at 13 n. 5.)

terms of the Agency Agreement, not an admission that defendants delayed negotiations to avoid paying Laub his commission.

 Finally, Laub cites a number of New York cases for the proposition that a broker who performs brokerage services and is the procuring cause of a transaction is entitled to a commission even if the transaction closes after the brokerage agreement itself has terminated.[5] However, parties to a brokerage contract may alter this rule by agreement. *See Levy v. Lacey,* 22 N.Y.2d 271, 274, 239 N.E.2d 378, 380, 292 N.Y.S.2d 455, 457 (1968) ("the parties to a brokerage agreement are free to add whatever conditions they may wish to their agreement"); *Thomson McKinnon Securities Inc. v. Cioccolanti,* 161 A.D.2d 523, 524, 555 N.Y.S.2d 792, 793–94 (1st Dep't 1990). The explicit provision in the Agency Agreement limiting Laub's commission to leases executed within 180 days of his termination is such an agreement replacing this background rule. Laub bargained away his "procuring cause" rights under New York law, and cannot seek now to assert those rights. Unless he can prove that defendants intentionally delayed lease negotiations to avoid paying him his fee, the unambiguous terms of the Agency Agreement prevent him from receiving a commission.

Neither the evidence discussed above nor any other evidence Laub submits raises a genuine issue of disputed fact that defendants intentionally delayed negotiations to avoid paying Laub a commission. Consequently, under the terms of the Agency Agreement, Laub is entitled to no commission for the lease renewal that was eventually executed and his suit for breach of contract must be dismissed. *See Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 148 (2d Cir.1993) ("[w]here the language is plain and unambiguous, a court

may construe the contract and grant summary judgment") (citation omitted).

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment is granted.

SO ORDERED.

---

5. Laub also contends that the version of the lease which was ultimately executed contained the same essential terms as the agreement he had negotiated. However, even if the executed version of the lease did not sub-

stantially change after his termination, this fact does not show that defendants delayed the negotiations. As discussed above, all of the evidence is to the contrary.